IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

ERNEST HUNTER, JR.                                                                                    PLAINTIFF

V.                                                                            CIVIL ACTION NO.4:11CV8-WAP-DAS

MICHAEL J. ASTRUE,
COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION                                                                                        DEFENDANT

REPORT AND RECOMMENDATION

This case involves an application pursuant to 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of Social Security ("Commissioner") denying the application of the claimant Ernest Hunter, Jr., for supplemental security income benefits. The parties have not consented to have the magistrate judge conduct all of the hearings in this case; therefore, the undersigned submits this report and recommendation to the United States District Judge.

1. PROCEDURAL AND FACTUAL HISTORY

The claimant filed an application for SSI benefits on June 28, 2008, alleging an onset of disability beginning on February 1, 2007. The application was denied initially and on reconsideration. After requesting and receiving a hearing, the administrative law judge ("ALJ"), found the claimant was not disabled. Hunter was thirty-two years old at the time of the hearing. He had an eighth grade education with limited ability to read and write. He claimed impairments of "bad nerves," (diagnosed as a psychotic disorder NOS), mental retardation, severe headaches and vision loss.

The claimant assigns five errors. The ALJ is alleged to have used the wrong legal standard in determining whether the claimant's impairments were severe. The claimant's psychotic disorder, NOS, was the only impairment judged severe. Hunter contends that he is

mentally retarded and that this is a severe impairment. The claimant contends that he meets the requirements in the Listing of Impairments for mental retardation, 20 C.F.R. Pt. 404, Subpt P., App.1, Listing 12.05, and should have been adjudicated disabled at Step 3. He claims error in the negative assessment of his credibility by the ALJ. He attacks the ALJ's residual functional capacity ("RFC") for purportedly failing to detail work limitations caused by his moderate difficulties in concentration, persistence and pace. This error, coupled with the inclusion by the vocational expert ("VE") of jobs the plaintiff says he cannot perform, is the basis for his assertion that the Commissioner failed to sustain his burden at Step Five.

## 2. LAW AND STANDARD OF REVIEW

In determining disability, the Commissioner, through the ALJ, works through a five-step sequential process.[1] The burden rests upon the claimant throughout the first four steps of this five-step process to prove disability. If the claimant is successful in sustaining the burden at each of the first four levels, the burden then shifts to the Commissioner at step five.[2] First, the claimant must prove he is not currently engaged in substantial gainful activity.[3] Second, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities...."[4] At step three the ALJ must conclude the claimant is disabled if he proves that his impairments meet or are medically equivalent to one of the

---

[1] *See*, 20 C.F.R. § 404.1520 (2012).

[2] *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).

[3] 20 C.F.R. § 404.1520(b) (2012).

[4] 20 C.F.R. § 404.1520(c) (2012).

impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, § § 1.00-114.02 (2011).[5] Fourth, the claimant bears the burden of proving he is incapable of meeting the physical and/or mental demands of his past relevant work.[6] If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, considering the claimant's residual functional capacity, age, education and past work experience, that he is capable of performing other work.[7] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove that he cannot, in fact, perform that work.[8]

This court's review of the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner, *Richardson v. Perales*, 402 U.S. 389, 401 (1971), and whether the correct legal standards were applied. 42 U.S.C. § 405 (g.); *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Substantial evidence has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401 (quoting *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938)). The Fifth Circuit has further held that substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"

---

[5] 20 C.F.R. § 404.1520(d) (2012). If a claimant's impairment meets certain criteria, then claimant's impairments are of such severity that they would prevent any person from performing substantial gainful activity. 20 C.F.R. § 404.1525 (2012).

[6] 20 C.F.R. § 404.1520(f) (2012).

[7] 20 C.F.R. § 404.1520(g)(1) (2012).

[8] *Muse*, 925 F.2d at 789.

*Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)). Conflicts in the evidence are for the Commissioner to decide, and if substantial evidence is found to support the decision, the decision must be affirmed even if there is evidence on the other side. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990). The court may not reweigh the evidence, try the case de novo, or substitute its own judgment for that of the Commissioner, *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988), even if it finds that the evidence preponderates against the Commissioner's decision. *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994); *Harrell*, 862 F.2d at 475. If the Commissioner's decision is supported by the evidence, then it is a conclusive and must be upheld. *Perales*, 402 U.S. at 390.

### 3. MEDICAL AND OTHER RECORDS

A review of the medical records and other evidence is necessary to the court's evaluation of Hunter's claim. The claimant's school records show he attended through the eighth grade. He and his sister reported to multiple sources that he had been a special education student throughout his time in school.[9] Hunter performed poorly in the first grade, but passed to the second grade. He then failed the second grade twice. His grades the following year were B's and C's. He maintained these grades through the fifth grade. His grades dropped off again in the sixth grade. There is no record that he attended the seventh grade. He attended the eighth grade but recorded failing grades. The school records neither confirm nor refute Hunter's claim that he was a special education student. The records do confirm attendance issues with absences ranging from a low of fourteen days to a high of eighty-nine days per school year. He said he

---

[9] The record is peppered with the sister's statements, but she did not testify at the hearing.

left school when he was expelled for being disruptive. His sister reported their mother let him do whatever he wanted and allowed him to drop out of school.

Hunter received mental health care from Life Help for a limited time in 2003 and 2004. During his first visit on July 30, 2003, he reported auditory hallucinations. The voices told him to defend himself and harm others. He was afraid to sleep at night. His girlfriend, who had a two-year-old child, was afraid he might hurt someone in the house. A provisional Axis I diagnosis of psychotic schizophrenia was given. The Axis III diagnosis provided he was legally blind in his left eye and had a learning disability.

On August 23, 2003, the claimant reported hallucinations for three to four years and trouble sleeping. He was alert but not oriented. He knows the day of the week, but not the month, year or his exact age. "Intellectual blunting" was noted and the impression was probable schizophrenia.

On October 31, 2003, he reported that he was doing better after being started on medications. His sister reported that he was sleeping better at night. Because he was still having occasional hallucinations, his medications were increased.

On May 14, 2004, he was discharged from Life Help for failing to keep appointments.

After his application for SSI, Dr. Darrell Blaylock examined him. He reported that being in sunlight triggered bad headaches. He had been having nightmares for years. Hunter's physical exam was normal, but a mental health consultation to evaluate his IQ was recommended. Vision testing rated his uncorrected vision at 20/200 in each of his eye, but the doctor questioned his effort on exam.

5

On September 30, 2008, Dr. Gilbert S. MacVaugh, Jr., conducted a mental status examination of the claimant and attempted administrations of the WAIS intelligence test. Claimant had previously been on disability. MacVaugh noted poor reliability of his statements. His motivation/cooperation levels were poor, though the doctor was not sure whether this "was by intent." His sister gave almost all of the history and reported he had been in special education. Hunter briefly worked with his father fixing tractor-trailer tires. He worked briefly at Dollar General before walking off the job. He couldn't get along with people. He had an extensive history of troubles with the law, including car thefts, apparently as a juvenile. He had been going to mental health but stopped because no one was taking him. He took the prescribed medicine, which he reported had helped, until they ran out. There were no psychiatric hospitalizations. Hunter had been married briefly and had a six-year-old child. Hunter stayed up all night, keeping his sister awake. She reported she had to make him take care of his personal hygiene. He attempted to help with chores but did not do them correctly.

When MacVaugh tried to communicate with Hunter directly, he did not respond, leading the doctor to conclude, "[i]t would seem as though his communication/social skills are impaired." He rocked back and forth during the examination. He could tell time on a non-digital clock and make phone calls. He was oriented to person but reported no recall of an elementary explanation provided earlier in the interview. He did not identify the year, month, day of the week, or date of the month. Though not incoherent, he did not volunteer information. He reported some delusional thoughts, but offered no explanations or details. He claimed to hallucinate when he slept.

Hunter seemed unable to recall the names of childhood friends, teachers, or favorite toys. He gave an incorrect street address and was unable to identify his Social Security number. MacVaugh found he had moderate to marked impairment of long term memory. MacVaugh found on testing that he also had marked impairment in short-term recall. Task persistence was poor and responses had marked poverty of content. MacVaugh found he had difficulty understanding or responding to elementary instructions. The Weschler Adult Intelligence Scale testing was discontinued because the doctor felt Hunter exhibited an incapacity to understand and respond to the elementary instructions necessary for testing. Hunter completed the word reading, spelling and math computation achievement tests, but scored extremely low. MacVaugh reported the claimant did not appear to be able to read any parts of words nor could he identify any printed letters. He could not accurately spell any words. He only made scribbling marks when asked to print his name. He made no response when asked to print letters. The doctor thought it was likely that "emotional factors (not by intent) adversely affected his test taking."

MacVaugh concluded that he was suffering from a psychotic disorder not otherwise specified, trichotillomania,[10] and unspecified mental retardation.[11] The history of anti-social behavior was noted. The doctor concluded that "[h]is overall adaptive functioning appears markedly impaired. He may well be psychotic."

---

[10] This is an irresistible urge to pull hair from the scalp or elsewhere from the body. Mayo Clinic website, www.mayoclinic.com/health/trichotillomania/DS00985.

[11] According to the ICD-10 Guide for Mental Retardation "unspecified mental retardation" means that there is evidence of mental retardation, but insufficient information is available to assign the patient to another category. The categories range from mild mental retardation through profound mental retardation.

MacVaugh recommended that in evaluating the case:

> [I]t would be wise to review his mental health center records, school transcripts, Special Ed Assessment Team Reports and the like. If what I saw in the office today is typical of his ongoing behavior I would conclude that he is not capable of being responsible for the provident use and management of his own funds. He is clearly not capable in terms of being able to perform routine and repetitive type tasks. He does not accept supervision well nor does he concentrate or pay attention. His communication/social skills are limited."

On February 5, 2009, Paul Kosko performed an eye exam. This time the claimant's vision was 20/30 on the right and 20/60 on the left without correction. His vision corrected to 20/30 in each eye.

He was seen at the Delta Health Center on May 26, 2009 with complaints of having bad headaches and insomnia. The physical and neurological examinations were normal. The doctor's impression was headaches, anxiety, and insomnia. He was referred back to Life Help.

## 4. ANALYSIS

### A. SEVERITY OF IMPAIRMENTS

The claimant asserts reversible error at Step Two in the evaluation process in the determination of the severity of the plaintiff's impairments. The ALJ found the claimant's mental condition--his psychosis NOS-- was his only severe impairment. He did not find the claimed mental retardation was a severe impairment. Hunter argues that the ALJ applied the wrong legal standard and that he is therefore automatically entitled to remand.

Title 20 C.F.R. § 404.1520(c) provides the requirements for a severe impairment. "If you do not have any impairment or combination of impairments which significantly limit your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled." This regulation and its sister "not severe"

8

regulation, 20 C.F.R. § 416.920 (c) have been the subject of a not inconsiderable controversy in the federal courts. The Fifth Circuit Court of Appeals in *Stone v. Heckler,* 752 F.2d 1099 (5th Cir. 1985) found that the language of the regulation had to be read in light of earlier, more liberally worded regulations defining severe impairment. The change in the language of the regulation was not supposed to make a substantive change in the regulation. In order to assure that the new language did not result in a different test for severity, the Fifth Circuit mandated the standard in *Stone* as follows: "[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of the age, education or work experience." *Estran v. Heckler*, 745 F.2d 340, 341 ( 5th Cir. 1984). The court in *Stone*, in the face of then existing agency practice of being noncompliant with the court's interpretation of Social Security regulations, issued its edict that in the future if the decisions of the administrative law judges did not cite to *Stone* or other case of like effect, the courts would assume the wrong standard had been applied and that any such cases would be subject to automatic reversal and remand.

In this case the administrative law judge explained:

> At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 416.920 (c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical or other evidence establish only a slight abnormality or combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.

9

With this language, the ALJ included citation to 20 C.F.R. § 416.921 and Social Security Rulings (SSRs) 85-28, 96-3p and 96-4p. Because this language does not precisely track the language of *Stone v. Heckler* and because it does not include an express reference to that case or other cases, the claimant asserts that the wrong standard has necessarily been used to determine the severity of his impairments and the court has no choice but to remand.

There are two problems with the claimant's argument. First, there is an indirect reference to *Stone* because the ALJ's opinion cites to SSR 85- 28. The Administration adopted this Ruling partly in response to *Stone v. Heckler* and other cases in order to provide a clarification of Social Security Administration policy on the "severe impairment" standard. This ruling specifically cites to *Stone* and *Estran*. It recites and adopts as consistent with its policy the above quoted language from *Stone* and states, "As *Baeder v Heckler,* No.84 -- 5663 (3rd Cir. July 24, 1985), suggested, the severity regulation is to do no "more than allow the Secretary to deny benefits summarily to those applicants with impairments of a minimal nature which could never prevent a person from working." SSR 58-28. Thus the ALJ has made the appropriate citation albeit indirectly, and the court finds it to be adequate. *Stewart v. Astrue*, 2009 WL 187581, *3 (M.D. La. Jan 26, 2009).

Second, the law does not require any magical incantation of particular words as an invariable prerequisite to a valid severity determination. *Hampton v. Bowen*, 785 F2d 1308 (5th Cir. 1986):

> *Stone* does not require a wholesale remand of all severity cases. A case will not be remanded simply because the ALJ did not use "magic words". We remand only where there is no indication that the ALJ applied the correct standard. We must read the opinion of the ALJ carefully to ensure he or she used the 'slight impairment' standard in the non-severity determination." *Id*. at 1311.

10

The courts must read the ruling and determine if the correct standard has in fact been used. A decision that recites *Stone,* may nevertheless apply the wrong standard. The 'magic words' do not immunize a flawed decision, nor should their absence fell a well-reasoned, well-supported decision that, in fact, applies the correct standard. The claim for automatic remand should be rejected.

While the burden to show that the ALJ applied the correct rests with the Commissioner, the claimant otherwise has the burden of showing error on appeal, specifically that the decision at step two is not supported by substantial evidence. While the plaintiff sets forth a heading in the brief that the decision is not supported by substantial evidence, he never assigns or challenges the severity determination on the basis of a lack of substantial evidence. While no one would suggest that mental retardation is not normally a serious impairment that can have profound negative impact on the lives of individuals and their families, the fact that this claimant says he is mentally retarded does not *per se* make mental retardation a severe impairment in this case.

The claimant never sets forth an argument specifically showing how the evidence of record satisfies even the low threshold for finding a severe impairment. There is only one diagnosis of "unspecified mental retardation" in the record. This diagnosis is soundly criticized by a State Disability Determination doctor as not being supported by other evidence. There is the report that he was a special education student and school records showing years of failing grades and years of all B's and C's. The records do not indicate whether the claimant is a special education student. The records do show poor to terrible attendance at school by the claimant. Because of his failure to cooperate with testing, there are no IQ scores. The value of the one diagnosis of mental retardation necessarily rests at least in part on the claimant's credibility -

credibility the ALJ determined was lacking.  It is not entirely clear if the mental retardation has been shown "by medically acceptable clinical and laboratory diagnostic techniques" to be an impairment.  20 C.F.R. § 404.1505

Even assuming that this diagnosis constitutes a medically determinable impairment, without test results the claimants's credibility is vital to the determination of severity.   As discussed *infra*, the ALJ found that the claimant lacked credibility.  The undersigned, reports for the reasons stated here and elsewhere in this report, that the determination of which impairments were severe was done pursuant to the standard enunciated in *Stone,* and the decision is supported by substantial evidence.

## B. STEP THREE ANALYSIS

The claimant asserts that the ALJ committed error in failing to find that the claimant's mental retardation met the listing for mental retardation under 20 C.F.R., Pt. 404, Subpt. P, App. 1 Lisiting 12.05.  Of course, the ALJ never performed this evaluation at the administrative level, having found that the alleged mental retardation did not constitute a severe impairment.
If the mental retardation severity determination is not set aside, there can be no error with regard to the listings of impairments.  If the mental retardation alleged is a 'not severe' impairment, it necessarily cannot satisfy the requirements of the listing of impairments.

Assuming for the sake of argument that the claimed mental retardation rises to the level of a severe impairment, the Listing of Impairments should normally be done first at the administrative level.  But the determination in this case is a foregone conclusion.  The parties have devoted time to the issues of proof under the introductory paragraph.  Not surprisingly they have disagreed on whether the proof meets the capsule definition and whether it shows

impairments prior to age twenty-two. While this argument addresses a preliminary requirement, which is normally addressed before looking at the severity prongs, skipping forward to those prongs, more readily demonstrates that the claimant cannot meet the listing.

Because there are no IQ results, Hunter must qualify under 12.05(A) or not at all. Under 12.05 (A) he must show "mental incapacity evidenced by dependence upon others for personal needs (e.g. toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded" *Id.* This severity prong provides a haven and a disability determination for the most unfortunate of souls who are so profoundly mentally retarded that their IQ escapes measurement. This claimant testified that he bathes, grooms and dresses himself. He can fix his own food and helps with household chores. He has some limited work experience and attended school for eight years. He showed at the hearing that he can speak with and listen to others and respond appropriately. He has been married in the past and has a child. He does not meet the definition of capacity set forth in Listing 12.05 (A). *Paulino v. Astrue*, 2010 WL 3001752 (S.D.N.Y. July 30, 2010) (claimant who is independent in basic activities such as dressing, personal hygiene and preparing food and who was alert and oriented did not meet the 1205(A) listing.).

## C. CREDIBILITY DETERMINATION

The ALJ found that the claimant's testimony was not credible and the claimant faults that determination. It is well-established that "[t]he evaluation of claimant's subjective symptoms is a task particularly within the province of the ALJ who has had the opportunity to observe whether this person seems to be disabled." *Harrell*, 862 F.2d at 479 (quoting *Elzey v. Railroad Retirement Board*, 782 F. 2d 162, 166 (5th Cir 1986)). It is likewise well-established that the ALJ's credibility determination is entitled the great deference. *Falco*, 27 F. 3d at 164.

Hunter argues the ALJ relied on MacVaugh's report that he was unreliable at testing and that his motivation and cooperation were poor, but did not accept MacVaugh's note that "this might not have been intentional." Of course the ALJ is not bound to accept or reject all of any doctor's finding. But the claimant fundamentally misunderstands the ALJ's credibility findings. The contrast between MacVaugh's report and the claimant's appearance at the hearing lead to the adverse credibility finding.

MacVaugh's report, if credited, might seem compelling proof of some type of disability and lend credence to the mental retardation claim. The administrative law judge, however, implicitly found that what MacVaugh saw in his office on the day of the consultative examination was not typical of the claimant. He found that the claimant's "allegations of mental symptoms as well as his testimony are less than credible." MacVaugh found marked memory impairments, while the ALJ found that Hunter "admitted having no significant problem with his memory." He noted that Hunter's presentation at MacVaugh's consultative exam "reflects adversely on his overall credibility." The ALJ found the claimant's failure to be responsive at testing resulted in the absence of IQ test scores. He found that Hunter had been unreliable both at testing and in his statements during the interview. The ALJ stressed again, "[t]here were obvious issues of credibility with his presentation" during this consultative examination.

In contrast to his behavior before MacVaugh, at the hearing, the claimant answered all questions without hesitation, confusion, or the need to repeat the questions. The ALJ concluded that "[w]hile it appears that the claimant has some mental problems, his testimony is unsupported by the minimal evidence in the record." Nor did the ALJ exhaust examples from the record that impeach the claimant's credibility. During MacVaugh's examination he "made scribbling marks when asked to print his name." The record shows that Hunter had no difficulty printing his name.

14

His printed signature appears on pages 15, 63, 64 and 154 of the record including signatures submitted by his attorney on the employment contract and the appointment of representative form.

Not only did Hunter not have a problem understanding and responding appropriately to questioning, but he was able to identify his Social Security number. He gave his age, date of birth, and his full street address and city. He said he could not read or write, and then immediately said he could read a little. He said he could count change some. He watched TV without difficulty. He reported that he helped with household chores including folding laundry, doing the dishes, and helping with yard work. Contrary to his sister's reports to MacVaugh, he said he could get his own food, as well as bathing, grooming, and dressing himself. He reported that he saw and maintained a relationship with his child. He lost his drivers license for failing to pay child support.

Perhaps the most telling difference from the unresponsive person whom MacVaugh reported and the Hunter witnessed by the ALJ at the hearing occurred during an exchange between the ALJ and the claimant's attorney. When the ALJ asked his attorney how many milligrams of one medicine were prescribed for Hunter, the attorney mistakenly responded "sixty." Hunter immediately corrected him saying "Two milligrams." He then reported the dosage of another medicine had not been changed.

MacVaugh's report falls with the claimant's credibility. Dr. Patricia Alexander, a state Disability Determination doctor, reviewed MacVaugh's evaluation and opined his determinations

were unsupported by other evidence. She found " no evidence of cognitive impairment" and attributed the failure of IQ testing to the claimant's "poor effort."[12]

Because the ALJ provided detailed reasoning as to why he believed the claimant lacked credibility, and because it was the ALJ who observed the claimant as he provided the testimony, the undersigned reports that substantial evidence supports the ALJ's credibility determination and recommends that it should be upheld.

### D. THE STEP FIVE DETERMINATION

Hunter asserts there were two errors at the step five analysis, one attributable to the ALJ and the second to the vocational expert

First, the claimant asserts that the ALJ was not specific enough in his assessment of residual functional capacity, given his finding at step three, that the claimant suffered moderate difficulties with concentration, persistence, and pace. The ALJ found no exertional limitations, but that the claimant was limited to employment that only required him to remember and carry out simple instructions. He also found that his employment should involve only occasional contact with the general public, supervisors, and coworkers. In making this RFC ruling, the ALJ specifically referenced the requirement that he make the "residual functional capacity assessment reflect the degree of limitation the undersigned has found in the "paragraph B" mental function

---

[12] Her comments included: [H]e was described as a poor historian. Sister gave most info. Poor school performance is reported which is corroborated by the school transcript, but sister reported clmt was frequently in trouble with the law. Claimant reported attending MHC about six months ago, but only records found are from 2003/4 for treatment for schizophrenia. **No indication of poor cognitive functioning**. **Unable to be tested at CE because of poor effort**. Given DX by CE psychotic D/O, NOS, and trichotillomania, history of antisocial behavior and unspecified mental retardation. **Some issues of credibility and CE's conclusions do not seem supported by other evidence**. While claimant appears to have some problems unable to accurately assess current level of functioning because of insufficient evidence.

16

analysis." The restriction set out by the ALJ clearly reflects consideration by the ALJ of the claimant's 'paragraph b' limitations. His finding on concentration, persistence and pace, provided that "[h]e testified that he worked for his father in 2004 off and on repairing tires, which earned him $7,564.00 self-employment. His work is indicative that he is capable of performing basic work activities." The undersigned reports that there has been no error in the formulation of the RFC.

Hunter alleges a second error occurred in the step five determination when the Vocational Expert ("VE") testified to three jobs the claimant could perform based on the ALJ's hypothetical. He argues the selected jobs do not comport with the RFC, as set forth in the hypothetical question, and that the claimant cannot, in fact, perform any of the jobs named by the VE. The ALJ found that the claimant could perform at all exertional levels, but as above noted, was limited to jobs where he was only required to remember and carry out simple instructions and which would limit his contact with others. The ALJ also instructed the VE to assume an illiterate individual.

The VE identified three jobs the claimant could perform: 1) cooks helper ( 16,400 jobs in state, 880,000 jobs nationally); 2) kitchen helper ( 3,600 jobs in state, 521,000 jobs nationally) and 3) poultry hanger (8,000 jobs in state, 499,000 jobs nationally). The claimant asserts that the first two jobs are inconsistent with the RFC. Both are classed at a higher reasoning level that require the capacity to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions." The claimant is correct. These jobs require skills not encompassed in the claimant's RFC. Those jobs may not be considered as proof supporting the step five determination.

The claimant also asserts that the vocational expert erred in the selection of the poultry hanger job. This job has a Language Level one requirement which can require some reading. Because this would not be consistent with the illiteracy assumed by the ALJ, the claimant asserts he cannot perform this job either. For several reasons, the error, if any, is harmless. Though the hypothetical assumed illiteracy, the final finding was the claimant had a limited education. This is consistent with his testimony that he could read some. The limited language requirements for this job are not inconsistent with his residual functional capacity as finally determined and he has not been prejudiced. Additionally the plaintiff's other two past jobs contained the same language requirements and the record does not indicate that he left either job due to language/reading problems. The claimant also argues that even without consideration of the language requirement, he cannot perform the job of poultry hanger. The ALJ's decision to the contrary is supported by substantial evidence and is therefore binding. There is no prejudicial error in the step five determination. Neither of these assignments requires reversal or remand.

## 5. CONCLUSION

The undersigned recommends that the decision of the Commissioner of Social Security denying SSI benefits to the claimant be affirmed and judgment entered for the defendant.

The parties are referred to 28 U.S.C. § 636 (b) (1) and Local Rule 72 (a) (3) for the appropriate procedure in the event any party desires to file objections to these findings and recommendations. Objections must be in writing and must be filed within 14 days of this date. Failure to timely file objections to the proposed findings and recommendations will bar an aggrieved party from challenging on appeal both the proposed factual findings and the proposed

legal conclusions that are accepted by the district court. *Douglas v.United States Automobile Association*, 79 F. 3d 1415 (5th Cir. 1996).

This the 2nd day of February, 2012.

<u>/s/ David A. Sanders</u>
UNITED STATES MAGISTRATE JUDGE